Jeffrey SHANKS,

v.

**HERCULES OFFSHORE CORPORATION.**

No. Civ.A. G–98–485.

United States District Court,
S.D. Texas,
Galveston Division.

July 29, 1999.

Kenneth Ross Citti, Citti & Crinion, Houston, TX, for Ross Citti, mediator.

Edward D Vickery, Royston Rayzor Vickery & Williams, Houston, TX, for Ed Vickery, mediator.

Stephen Kurt Siess, Clark Depew & Siess, Houston, TX, for Jeffrey Shanks, plaintiff.

Glenn R Legge, Legge Farrow Kimmitt and McGrath, Houston, TX, for Hercules Offshore Corporation, defendant.

## ORDER DENYING DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT

KENT, District Judge.

Plaintiff brings this action under the Jones Act, 46 U.S.C.App. § 688 *et seq.*, and the general maritime law, alleging that he suffered injuries while working as a floorhand aboard a jack-up drilling barge owned by Defendant. Now before the Court is Defendant's Motion for Partial Summary Judgment of May 27, 1999. For the reasons set forth below, Defendants' Motion is **DENIED.**

### I. FACTUAL SUMMARY

In 1996, Defendant Hercules Offshore Corporation purchased a jack-up drilling barge at foreclosure for $2.3 million. The rig had been "cold stacked" in Cameron, Louisiana, since 1994, and remained cold stacked until September 1997. Upon purchase, Defendant redesignated the rig "Hercules Rig 14" and began refurbishing it, ultimately towing it to Orange, Texas, where its refurbishment was completed in drydock. Among other things, Defendant repaired the legs, which had become structurally unsound, removed and replaced the hull, which had become unsound for drilling operations, and replaced the primary generators. In August 1998, Defendant redeployed Rig 14 as a drilling vessel.

Plaintiff Jeffrey Shanks began working as a floorman aboard Rig 14 in November 1996, a few months after Defendant had purchased it. At that time, Rig 14 was still cold stacked. Between November 24, 1996 and September 9, 1997, Plaintiff worked exclusively aboard Rig 14 with the exception of a small number of days during which he filled in aboard other rigs owned by Defendant. While aboard Rig 14, Plaintiff served alongside several other workers who were more or less permanently stationed aboard the rig, taking meals, sleeping, and showering there. Plaintiff performed maintenance tasks including painting and chipping.

On September 9, 1997, Plaintiff and several other workers were stripping drill line through the traveling blocks, a task performed in anticipation of Rig 14's transportation to the shipyard in Orange, which was set for later that month. As Plaintiff worked, a chain, steel flange, and snatch block fell out of the rig's derrick, striking Plaintiff in the back. Plaintiff suffered several injuries and has not returned to work since the incident. His employment with Defendant has since been terminated.

### II. ANALYSIS

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). When a motion for summary judgment is made, the nonmoving party must set forth specific facts showing that there is a genuine issue for trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Issues of material fact are "genuine" only if they require resolution by a trier of fact. *See id.* at 248, 106 S.Ct. at 2510. The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. Only disputes over facts that might affect the outcome of the lawsuit under governing law will preclude the entry of summary judgment. *See id.* at 247–48, 106 S.Ct. at 2510. If the evidence is such that a reasonable fact-finder could find in favor of the nonmoving party, summary judgment should not be granted. *See id.; see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Dixon v. State Farm Fire & Casu-*

*alty Co.,* 799 F.Supp. 691 (S.D.Tex.1992) (noting that summary judgment is inappropriate if the evidence could lead to different factual findings and conclusions). Determining credibility, weighing evidence, and drawing reasonable inferences are left to the trier of fact. *See Anderson,* 477 U.S. at 255, 106 S.Ct. at 2513.

Defendant seeks summary judgment against Plaintiff's claims under the Jones Act on the grounds that Plaintiff was not a seaman for purposes of the Jones Act at the time of his injury. To recover under the Jones Act, an injured plaintiff must be a seaman. 46 U.S.C.App. § 688; *White v. Valley Line Co.,* 736 F.2d 304, 305 (5th Cir.1984). Determination of seaman status may be appropriate at the summary judgment stage. *Garret v. Dean Shank Drilling Co., Inc.,* 799 F.2d 1007, 1009 (5th Cir.1986) (stating that seaman status is usually a question of fact but may be decided as a matter of law where the facts demonstrate beyond question the absence of seaman status); *White,* 736 F.2d at 305. To meet the test for seaman status, a worker must prove that he (1) was permanently assigned to, or performed substantial work on, a vessel in navigation; and (2) contributed to the function of the vessel or the accomplishment of its purpose. *See Barrett v. Chevron, U.S.A., Inc.,* 781 F.2d 1067, 1073 (5th Cir.1986); *Slaydon v. Sonat Offshore Drilling, Inc.,* 818 F.Supp. 1009, 1010 (S.D.Tex.1993). Defendant claims that Plaintiff was not a seaman, and thus not covered by the Jones Act, because Hercules Rig 14 was not in navigation when Plaintiff suffered his injury.

The test for whether or not a vessel is "in navigation" has been stated by the United States Court of Appeals for the Fifth Circuit to be whether it is "engaged as an instrument of commerce and transportation on navigable waters." *Williams v. Avondale Shipyards, Inc.,* 452 F.2d 955,

958 (5th Cir.1971); *Garret,* 799 F.2d at 1009. Although this usually involves a determination of fact, the question of whether a ship is in navigation can be appropriate on summary judgment where the facts clearly indicate that the test has been met. *Garret,* 799 F.2d at 1009. A number of factors guide the Court's analysis in cases such as this one, where the ship was in repair at the time of the injury. First, the determination of whether a ship in repair is still in navigation depends upon the nature and extent of the repairs and who controls those operations. *See Wixom v. Boland Marine & Manufacturing Co.,* 614 F.2d 956, 957 (5th Cir.1980). Additionally, the Court looks to the time and cost required for the repair work, as well as whether the ship's power is secured or dismantled and whether the ship's crew is dismissed. *See id.; Slaydon,* 818 F.Supp. at 1011.

The Court first addresses the nature and the extent of the repairs to Hercules Rig 14. Defendant apparently spent the time Rig 14 was cold stacked in Cameron and drydocked in Orange correcting twenty-eight "nonconformances" identified in a September 14, 1995 report issued by Det Norske Veritas, a Norwegian-based class society that certifies vessels for certain uses. Of those twenty-eight nonconformances, the overwhelming majority were either minor repair items or items requiring periodic inspection, testing, or servicing.[1] Of the nonconformances listed in the DNV Report, only two were arguable major, structural repairs. First, the doubler plates in the rig's hull had to be replaced. Second, three of the rig's five primary engines were out of order and had to be repaired and replaced. In addition, Defendant points out that the rig's jack-up legs required significant overhaul. However, at least one of the engines had been repaired by February 1997, and the hull repairs had progressed far enough by the

---

1. For example, item 10 was replacement of the rig's windsock, items 15 and 16 were the repairs to the gratings in the mud pit room and atop the derrick, respectively, item 26 was testing, and, if necessary, repair or replacement of all valves, and item 28 was the installation of a fire retardant layer in the engine room ceiling.

time of Plaintiff's injury that Rig 14 could be towed within two or three weeks to drydock in Orange, where the work on its legs would be performed.

The Court next turns its attention to whether Defendant retained operational control over Rig 14 during the time it was under repair. Plaintiff has introduced evidence that Defendant retained full control over all operations and crew activities aboard the rig. Defendant makes no argument to the contrary.

Next, the Court looks to the time and cost of the repair work. The rig was cold stacked from 1994 until September 1997, one year after it was purchased by Defendant. In September 1997, a short time after Plaintiff's injury, Defendant towed the rig to a shipyard on Orange, where it was drydocked from September 28 until October 11, 1997. Defendant then returned the rig to drydock on February 4, 1998, where it remained until May 21, 1998. The cumulative five months or so that Rig 14 spent drydocked do not in and of themselves compel the conclusion that the rig was out of navigation. *See Chandris, Inc. v. Latsis,* 515 U.S. 347, 374–75, 115 S.Ct. 2172, 2193, 132 L.Ed.2d 314 (1995) (noting that six months in drydock appeared to be "a relatively short period of time for important repairs on oceangoing vessels"). The approximately three years that Rig 14 spent cold stacked provides more support for Defendant's position. However, Plaintiff's efforts at the time of his injury were focused on preparing the rig for its voyage to Orange, where it would be launched following a relatively brief period in drydock. That fact supports the conclusion that Plaintiff was performing work aboard a vessel in navigation at the time of his injury. Likewise, the cost of the repairs supports Plaintiff's position. Defendant's price tag for the repair work to Rig 14 was approximately $5 million. While that cost is greater than the $2.3 million Defendant payed for the rig, it is much less significant when compared to the $50 million value of the rig in 1982, the year it was built.

Finally, the Court looks to whether the rig's power sources were dismantled or on-line and whether the crew was on board or dismissed. Plaintiff's summary evidence indicates that at least two of Rig 14's engines were running at all times. In fact, at the time of Plaintiff's accident, the rig was entirely self-powered. In addition, Defendant maintained a reduced complement of crew on board the rig throughout the time Plaintiff was employed. Although the crew was smaller in number than it would be with the rig in full service, summary evidence indicates that the key positions aboard the rig were all filled.

The summary evidence indicates that Rig 14 was either cold stacked or drydocked for a substantial period. In many cases, the duration of the rig's inactivity would support a finding that it was out of navigation. However, during the time immediately preceding Plaintiff's injury, he and the other crew members aboard the rig were preparing it for a voyage to the shipyard where it would be drydocked for a brief period before being redeployed as a drilling vessel. The Court is well aware that it must not employ a "snapshot" test in determining seaman status. *See Chandris,* 515 U.S. at 363, 115 S.Ct. at 2187 (*citing Easley v. Southern Shipbuilding Corp.,* 965 F.2d 1, 5 (5th Cir.1992) (warning against "inspecting only the situation as it exists at the instant of injury" and emphasizing a study of the overall relationship between a worker and vessel or fleet)). Based on the evidence submitted, however, a fact finder could find that Rig 14 was in navigation during the time Plaintiff was employed. The majority of the repairs were minor rather than fundamental, the expense of those repairs was small compared to the cost of the rig, the rig provided its own power, and Defendant maintained a crew aboard it at all times. For those reasons, the Court concludes that Plaintiff has raised a fact issue with respect to his seaman status. Defendant's Motion for Partial Sum-

mary Judgment on the issue of seaman status is therefore **DENIED.**

### III. CONCLUSION

For the reasons set forth above, the Court concludes that Plaintiff has raised a genuine issue of material fact with respect to his status as a seaman under the Jones Act. Defendant's Motion for Partial Summary Judgment on the issue of Plaintiff's seaman status is **DENIED.** This case remains set for bench trial on August 9, 1999. The Court will address this issue again at that time. The parties are **ORDERED** to bear their own taxable costs and expenses incurred herein to date.

**IT IS SO ORDERED.**